IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

JOSHUA SISCO

PLAINTIFF

V.                                                        Case No.: 3:21cv059-DMB-RP

UNIVERSITY OF MISSISSIPPI, and
GLENN BOYCE                                              DEFENDANTS

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Joshua Sisco ("Sisco"), a graduate of the University of Mississippi (the

"University"), has lodged parallel disability discrimination claims against the University[1]

under both the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of

1973 (the "Rehab Act"), claiming that the University discriminated against him during

his enrollment because of his disability. Even after amending his Complaint, Sisco lacks

standing to pursue many of his claims for injunctive relief, his ADA claim is barred by the

Eleventh Amendment, and his Rehab Act claim fails to state a plausible claim for relief.[2]

The Court should dismiss Sisco's claims in their entirety for lack of subject matter

jurisdiction or failure to state a claim.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY[3]**

Joshua Sisco enrolled as a student at the University of Mississippi in 2015 and

---

[1] Sisco also asserts his claims against Chancellor Glenn Boyce in his official capacity as duplicative claims against the University itself. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70 (1989).

[2] The University disagrees with Sisco's fact allegations and asserts that Sisco's claims are barred by other affirmative defenses but reserves those issues for another day should Sisco's claims survive Rule 12.

[3] For purposes of this Motion only, Defendants accept as true Sisco's well-pled allegations.

1

was provided various accommodations and auxiliary aids by the University throughout his enrollment. First Am. Compl. p. 3 ¶ 16, pp. 9-10 ¶¶ 68, 77, 85, 91 [Doc. 14]. Sisco successfully graduated from the University with an undergraduate degree in 2019, and immediately enrolled in a master's degree program at the University. First Am. Compl. p. 3 ¶ 23. Sisco has now sued the University under the Americans with Disabilities Act and the Rehabilitation Act.

Facing a Motion to Dismiss, he amended his original Complaint (the First Amended Complaint is referred to herein for convenience as "the Complaint"), and he now claims that the University discriminated against him by failing to caption three videos in one of his classes and one video at a related after-hours lecture, failing to caption certain of its Instagram, Twitter, and Facebook posts, failing to ensure captioning was enabled around the clock on its TVs at the Pavilion and School of Education, and failing to caption its televised student-news broadcast for the entirety of his enrollment at the University. First Am. Compl. pp. 4-9 [Doc. 14].

## STANDARD OF LAW

A Rule 12(b)(1) motion challenges the plaintiff's invocation of federal subject matter jurisdiction and questions the very power of the court to hear the case. *See Krim v. PCOrder.com, Inc.*, 402 F.3d 489, 494 (5th Cir. 2005). When one party challenges subject matter jurisdiction, the party asserting jurisdiction bears the burden of establishing jurisdiction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 646 F.3d 185, 189 (5th Cir. 2011). To resolve a motion to dismiss for lack of subject matter jurisdiction, a court may consider

(1) the complaint alone, (2) the complaint supplemented by undisputed facts in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *See Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986) (cited in *Davis v. Ashley Furniture Indus.*, 2009 WL 605741 *1 (N.D. Miss., Mar. 9, 2009)).

Rule 12(b)(6), on the other hand, authorizes dismissal for failure to state a claim. "To avoid dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "To be plausible, the complaint's factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 570 (internal quotation omitted). In making this determination, the court accepts all well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). The court does not, however, accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

## ARGUMENT AND ANALYSIS

Sisco pleads his claims generically and in scattershot fashion because each claim fails when subjected to Rule 12. While he cobbles together several claimed accessibility issues arising from the University's alleged failure to caption assorted content during his enrollment at the University, he either lacks standing to pursue his requested relief, his

claims are barred by the Eleventh Amendment, they fail to state any plausible claim for relief, or they require administrative exhaustion. Despite his recent amendment, Sisco's Complaint should still be dismissed in its entirety.

**I. Sisco lacks standing to pursue his TV captioning claim, his NewsWatch captioning claim, and much of the injunctive relief he seeks as to his social media captioning claim and class video captioning claim.**

"[B]efore a federal court can consider the merits of a legal claim, the person seeking to invoke jurisdiction must establish the requisite standing to sue." *Whitmore v. Ark.*, 495 U.S. 149, 154-55 (1990). This requires a plaintiff to demonstrate that he or she has suffered an injury in fact that is traceable to the defendant's conduct which will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Standing is evaluated on a claim-by-claim basis, and the plaintiff must be able to establish standing for each claim and each form of relief sought. *Latitude Sols. Inc. v. DeJoria*, 922 F.3d 690, 695 (5th Cir. 2019) ("[A] plaintiff must demonstrate standing for each claim he seeks to press and have standing separately for each form of relief sought."); *see also Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir. 2015) ("standing is not dispensed in gross.").

In other words, a plaintiff must demonstrate for each claim "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Crawford v. Hinds Cnty. Bd. of Supervisors*, 2021 U.S. App. LEXIS 18001, *6 (5th Cir. Jun. 16, 2021) (internal quotation omitted). Critically, "plaintiffs seeking injunctive and declaratory relief can satisfy the

4

redressability requirement only by demonstrating a continuing injury or threatened future injury." *Id*. (quoting *Stringer v. Whitley*, 942 F.3d 715, 720 (5th Cir. 2019)).

That threated future injury "must be an injury in fact," which requires that the future injury be "imminent" or that there be a "substantial risk" that such injury will occur in the future. *Id*. Further, while "past wrongs" may provide evidence of the likelihood of future injury, the plaintiff must do more to show that the threat of future injury is more than speculative in nature. *See id*. (internal quotations omitted). Specifically in the context of ADA and Rehab Act claims, courts have required plaintiffs to articulate a particular reason that they will be excluded in the future, or intend to return to the facility at issue, to secure injunctive relief. *See Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 656 (4th Cir. 2019) (noting that plaintiff could not "create standing in the absence of an otherwise plausible assertion" that he intends to return to place at issue); *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013) (finding that plaintiff had standing based on his assertion that he would return to an allegedly non-compliant facility while on regular trips to area).

Here, after amendment, Sisco bases his claims on four discrete alleged accessibility issues at the University. First, he claims that the University fails to properly caption its social media videos, including "promotional videos, press conferences, and interviews with players," which Sisco contends that he enjoys following on "various social media platforms, including Facebook, Twitter, and Instagram." First Am. Compl. p. 4 [Doc. 14]. Second, he asserts that the University fails to properly caption TVs in

common areas on its campus, but he references only alleged issues with TVs in the Pavilion and the University's School of Education. First Am. Compl. pp. 5-6.

Third, he complains that NewsWatch, a news broadcast produced by students at the University, was not captioned when he first enrolled at the University, but that the University began captioning the content in response to his pre-litigation complaints. First Am. Compl. p. 10. Fourth and finally, Sisco alleges that one of his professors played three un-captioned videos in class and then allowed a guest speaker to play an un-captioned video during an after-hours lecture. Sisco further alleges that the University instructed the professor throughout the semester to play only captioned videos, and that toward the end of the semester the professor began providing captions for any videos. First Am. Compl. pp. 8-9.

As claimed redress for those alleged accessibility issues, Sisco generically asks the Court to provide equitable and/or injunctive relief to: 1) declare that Defendants' conduct violates federal law, 2) enjoin Defendants to "remedy" the alleged illegal conduct and "prevent similar occurrences in the future," 3) "put into place policies and training to prevent future violations," 4) raise Plaintiff's grade in Chinese history, and 5) partially refund Plaintiff's tuition. *See* First Am. Compl. pp. 12-13.

Under even the most lenient analysis, and even after having amended his original pleadings, Sisco has standing to pursue only a fraction of his claims. Sisco has graduated from the University and his Complaint expresses no intent to return to the School of Education or the Pavilion, the only locations on campus where he pleads that he encountered uncaptioned televisions. He includes no allegations regarding even the

possibility of any return to the School of Education. While he does assert that he has friends who are managers for the University's basketball team, he fails to allege that he intends to return to the Pavilion to actually watch the basketball team. Moreover, Sisco does not take issue with whether the TVs were captioned or uncaptioned during basketball games, but instead claims that the TVs were uncaptioned when he ate lunch on campus as a student. Sisco does not allege that he intends to continue eating lunch on campus even though he has graduated. Accordingly, Sisco has not plausibly alleged any imminent injury as to those claims and he lacks standing to pursue any relief as to his TV captioning claims.

As to his NewsWatch captioning claim, Sisco's own allegations reveal that NewsWatch began captioning its content before he filed his Complaint. Moreover, he pleads no facts to suggest that he continues to suffer any harm from the University's purported failure to caption those broadcasts when he first arrived on campus. Sisco lacks standing to pursue any injunctive relief related to NewsWatch as well.

Even as to his other two claims related to the captioning of videos in his Chinese history class or the captioning of various social media posts on Facebook, Twitter, or Instagram, for which Defendants concede he has standing to pursue at least *some* relief, Sisco's requests for relief go well beyond that limited standing. While Sisco may have standing to seek injunctive relief related to his own grades at the University, he lacks standing to pursue relief that will not directly benefit him, and his requests for injunctive and/or declaratory relief to "prevent similar occurrences in the future" and/or "put in place policies and training to prevent future violations" will not directly benefit him as a

7

former student and should be dismissed for lack of standing. Likewise, he lacks standing to pursue relief related to the University's use of social media platforms beyond the issues he claims to have experienced and pled the possibility of experiencing in the future. Those claims should likewise be dismissed.

**II. The Eleventh Amendment bars Sisco's ADA claims.**

The Eleventh Amendment "bars an individual from suing a state in federal court unless the state consents to suit or Congress has clearly and validly abrogated the state's sovereign immunity." *Perez v. Region 20 Educ. Serv. Cntr.,* 307 F.3d 318, 326 (5th Cir. 2002). The Eleventh Amendment applies not only to the State itself, but to any state agency or entity deemed to be an arm of the State, including official capacity defendants. *Id*. If applicable, it bars all actions against the State entity, whether the relief sought is injunctive, declaratory or monetary. *Pennhurst St. Scho. & Hosp. v. Halderman*, 465 U.S. 89, 100-01 (1984); *Briggs v. Mississippi*, 331 F.3d 499, 503 (5th Cir. 2003).

The Supreme Court has established a three-part test to determine whether Title II validly abrogates a state's sovereign immunity in any given case. *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020) (citing *United States v. Georgia*, 546 U.S. 151, 159, 126 S. Ct. 877 (2006). To decide whether a claim under Title II validly abrogates a state's Eleventh Amendment immunity, the court must on a "claim-by-claim basis" determine: 1) which aspects of the State's alleged conduct violated Title II, 2) to what extent such misconduct also violated the Fourteenth Amendment, and 3) insofar as such misconduct violated Title II but did not violated the Fourteenth Amendment,

whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. *Id.* at 617.

The University and the Chancellor in his official capacity are both considered arms of the State of Mississippi for purposes of Eleventh Amendment immunity. *Washington v. Jackson State Univ*., 532 F. Supp. 804, 814 (S.D. Miss. 2006); *State v. IHL*, 387 So.2d 89, 91 (Miss. 1980) (declaring IHL to be "a constitutionally created state agency."). Accordingly, unless Sisco's allegations state a claim under Title II that also alleges a Fourteenth Amendment violation, the Eleventh Amendment bars his ADA claim unless he can show that Congress's attempted abrogation was nonetheless valid. *See Shaikh v. Tex. A&M Univ.,* 739 F. App'x 215, 225 (5th Cir. 2018); *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 617 (5th Cir. 2020). Where the plaintiff's allegations fail to allege even a violation of Title II, however, the Court need not reach that question to find Eleventh Amendment immunity. *Block*, 952 F.3d at 618-19, n. 11 ("Under *Georgia*, only if a plaintiff has alleged conduct that violates Title II and does not violate the Fourteenth Amendment should a court determine whether Title II is valid Section 5 legislation as to that class of conduct. If a plaintiff alleges no conduct that violates Title II, the inquiry ends."). And although Sisco's parallel Rehab Act claim does not implicate the University's Eleventh Amendment immunity, the Court should still first consider the University's immunity defense where the difference in causation standards is applicable to the facts of the case. *See Pace v. Bogalusa City Sch. Bd*., 403 F.3d 272, 289 (5th Cir.

2005) (declining to consider Eleventh Amendment immunity because the difference in causational standards was not implicated in a challenge only to architectural barriers).[4]

### A. Sisco has not stated a plausible disability discrimination claim under Title II of the ADA.[5]

The ADA forbids discrimination against disabled individuals in major areas of public life, among them employment (Title I of the Act), public services (Title II), and public accommodations (Title III). *Gil v. Winn-Dixie Stores, Inc.*, 993 F.3d 1266, 1274 (11th Cir. 2021) (citing *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001)). Title II generally "requires public entities to make 'reasonable modifications in policies, practices, or procedures' for disabled individuals, unless the entity can show that a modification would 'fundamentally alter the nature' of the service or program it offers." *Knighton v. Univ. of Tex. at Arlington*, 2020 U.S. Dist. LEXIS 53355, *12 (N.D. Tex. Mar. 27, 2020) (citing 28 C.F.R. § 35.130(b)(7)(i)). The plaintiff, however, "bears the burden of showing that he requested a modification and that it was reasonable." *Id*.

### 1. Sisco's generic allegations related to content on Facebook, Twitter, and Instagram fail to state a claim for relief under Title II of the ADA.

Under Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by such entity."

---

[4] If applicable, the ADA and the Rehab Act are "generally interpreted *in para materia* and employ the same legal standards," except the Rehab Act requires a stricter showing as to causation. *See Miraglia v. Bd. of Sup's of La. State Museum*, 2016 U.S. Dist. LEXIS 147192, *4 n. 1 (E.D. La. Oct. 24, 2016) (citing *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011); *see also Soledad v. United States Dep't of Treasury*, 304 F.3d 500, 504 (5th Cir. 2002) (analyzing separate causation standards).

[5] For these same reasons, Sisco's ADA claim fails to state a claim pursuant to Rule 12(b)(6).

42 U.S.C. § 12132; see also 28 C.F.R. § 35.130(a). Similarly, pursuant to the Department of Justice's program accessibility regulations, "[a] public entity's services, programs, or activities, when viewed in their entirety, must be readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a); *see also Ernest v. Univ. of Phoenix*, 2010 U.S. Dist. LEXIS 153860, *8 (S.D. Cal. Jul. 27, 2010) ("compliance with the ADA and Rehabilitation Act does not require perfect accommodations or that every aspect of the program be accommodated."). While the ADA does not define the "services, programs, or activities" of a public entity, the Rehabilitation Act defines a "program or activity" as "all of the operations of . . . a local government." *Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011) (citing 29 U.S.C. 794(b)).

The text of the ADA, however, does not specifically reference internet accessibility,[6] and Courts have struggled to determine if and to what extent the ADA's requirements apply to strictly online content despite generic assertions from the Department of Justice that it should apply. *See Gil*, 993 F.3d at 1277 n. 13 (collecting authority and noting that while the Eleventh Circuit had joined several sister circuits in holding that Title III does not apply to websites, other circuits have disagreed).[7] Notably, Defendants have been unable to identify a single court within the Fifth Circuit that has

---

[6] Although the Department of Justice has generally taken the position that the ADA does apply to the internet, the Department failed to issue any rules and regulations regarding internet accessibility "despite being aware of this issue for years." *See Price v. City of Ocala*, 375 F. Supp. 3d 1264, 1270 (M.D. Fla. 2019); *see also Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 402 (E.D.N.Y. 2017) (noting the delay in the Department's rulemaking despite being queried by members of Congress on the issue as early as 1996).

[7] *See also Price v. Town of Longboat Key*, 2019 U.S. Dist. LEXIS 84086, *4 (M.D. Fla. May 20, 2019) (noting lack of guidance as to Title II claims in the website context).

ever held the ADA applies to website content under either Title II or Title III, and Fifth Circuit district courts appear to have uniformly rejected applying Title III to website content. *See Zaid v. Smart Fin. Credit Union*, 2019 U.S. Dist. LEXIS 11363, *15 (S.D. Tex. Jan. 24, 2019) (finding under Title III that "[b]ecause a website is not a place of public accommodation under the ADA, [defendant] cannot be liable for its website's alleged failure to comply with the ADA.").[8]

The Eleventh Circuit recently joined the chorus of courts holding that Title III does not apply to web content because websites are not places of "public accommodation." *Gil*, 993 F.3d at 1277. In reaching that conclusion, the court relied heavily on the fact that Title III does not list any "intangible places or spaces, such as websites," as places that are covered by the ADA's requirements. *Id*. And while the court's holding specifically turned on *whether websites are places of public accommodation under Title III of the ADA*, other federal districts court have held that ADA cases analyzing the peculiarities of websites may be relevant in the context of both Title II and Title III. *See Price v. Escalante-Black Diamond Golf Club, LLC*, 2019 U.S. Dist. LEXIS 76288, *18 (M.D. Fl. Apr. 29, 2019) (observing that factors used to determine standing in Title II website case were relevant to Title III website case), *Gil v. Broward Cnty., Fla*., 2018 U.S. Dist. LEXIS 225828, * 5 (S.D. Fla. May 7, 2018) (looking to Title III caselaw to determine

---

[8] *See also Strojnik v. Landry's, Inc*., 2019 U.S. Dist. LEXIS 22873, *15 (S.D. Tex. Dec. 9, 2019) (again rejecting website as a public accommodation covered by the ADA); *Rosales v. Concentra Operating Corp*., 2017 U.S. Dist. LEXIS 222821, *3 (W.D. Tex. Feb. 13, 2017) (noting that determination of whether a website is considered a "place of public accommodation" under Title III was a "matter of first impression in this Circuit" but dismissing plaintiff's complaint on standing grounds instead).

whether plaintiff had standing to challenge website accessibility under Title II); *but see Price v. City of Ocala*, 375 F. Supp. 3d 1264, 1273 (M.D. Fl. 2019) (advocating for separate standing inquiry in Title II website cases).

Moreover, other courts have noted that Title III imposes more onerous obligations than Title II, yet Sisco attempts to use Title II to foist far more onerous requirements on governmental entities than any Fifth Circuit district court has been willing to impose upon private entities pursuant to Title III. *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 882 (9th Cir. 2004) ("Title III imposes obligations distinct from those imposed by Title II, and more onerous ones."); *Equal Rights Ctr. v. Dist. of Columbia*, 741 F. Supp. 2d 273, 284 (D.D.C. 2010) (observing that "Title III's prohibitions are both more extensive and more specific" than those of Title II and "[h]ad Congress wished to subject State and local government programs to the identical exacting rules of accessibility imposed on private entities in Title II, it could have easily done so.").

Above and beyond whether Title II does or does not apply to websites generally, however, Sisco has still failed to state a plausible a claim based on his nebulous web-based fact allegations. After all, even those courts that have opined that Title II does apply to web content have required the plaintiff to identify specifically what information is inaccessible to state a web-based claim under Title II. *Price v. City of O*cala, 375 F. Supp. 3d 1264, 1267 (M.D. Fla. 2019).

In *City of Ocala*, for instance, the plaintiff alleged that a Florida municipality had violated Title II because portions of the city's website were inaccessible with his screen

13

reader. 375 F. Supp. 3d at 1267. Although the plaintiff there stated that he was "interested in documents related to the budget of the City of Ocala (electronic documents) for 2018, 2017, 2016, and 2015 and all City Council agendas and back up material for year 2018, 2017 and 2016," the court held that he had failed to "specify precisely what documents were inaccessible." *Id*. at 1267, 1267 n. 2. Accordingly, while the Court ultimately dismissed the plaintiff's complaint for lack of standing, it further noted that the plaintiff had failed to state a claim under Title II because he had also failed "to allege what information [was] inaccessible." *Id*. at 1267 n.2, 1277 n.16 ("had the City argued that Price failed to state a claim under Title II, the Court would have granted the Motion on that basis as well.").

And even in the non-internet context, the Fifth Circuit has held that a plaintiff's allegations must relate to a "service, program, or activity" provided by the governmental entity itself, not some other party. Illustratively, in *Ivy v. Williams*, the plaintiffs alleged that they had been excluded from or denied the benefits of driver education courses, a benefit they claimed the defendant provided. 781 F.3d 250, 255 (5th Cir. 2015). The court therefore had to determine whether driver education was in fact a "service, program, or activity" provided by the defendant governmental agency. *Id*. The Fifth Circuit concluded that it was not, holding that although the defendant licensed and regulated schools that in turn provided such services, the defendant did not "teach driver education, contract with driver education schools, or issue driver education certificates to individual students." *Id*. at 255.

14

Accordingly, while a governmental entity's "operations" may be interpreted broadly, the purportedly denied service or benefit must still be some service actually provided by the governmental agency. *See also Althouse v. Roe*, 542 F. Supp. 2d 543, 577 (E.D. Tex. 2008) (rejecting plaintiff's discrimination claim even when "**assuming that television is a 'service, program or activity for which the defendants are responsible, a rather dubious assumption** . . .") (emphasis added).

Here, Sisco both fails to specifically identify what alleged documents or information were inaccessible, and then seeks to apply Title II's requirements not to the University's own websites but to content posted on websites or apps owned, operated, and provided by other unrelated private corporations such as Instagram, Twitter, and Facebook.

In terms of identifying the alleged inaccessible internet content, Sisco generically asserts that "the social media accounts associated with Ole Miss Athletics and Ole Miss's various sports teams feature videos that are rarely, if ever, captioned." First Am. Compl. p. 4 ¶ 29 [Doc. 14]. He then goes on to assert that the "videos include (but are not limited too [sic]) promotional videos, press conferences, and interviews with players," but still fails to identify even the specific athletic team accounts at issue, much less the specific content or posts he claims are inaccessible. *Id*. at ¶ 36. Without more, Sisco has failed to plausibly allege that documents or information related to the University's programs, services, or activities are inaccessible.

Moreover, Sisco's social media-based claims are based on his inability to fully interact with social media platforms such as Facebook, Twitter, and Instagram, not the

University's own website or web applications. Based on Sisco's allegations, the University has various social media accounts and uploads content to those platforms, but it does not actually provide that social media service or content to Sisco. Instead, that content and the underlying service is provided to Sisco by the social media platforms themselves, and Sisco's real complaint is that Facebook, Twitter, and Instagram have not provided him with a necessary auxiliary aid to access content streamed on their respective apps or websites. Accordingly, even if this Court takes the lead in the Fifth Circuit in holding that Title II applies to website content, Title II still would not apply to content posted not on the University's own website but instead to a third-party social media platform. Sisco's allegations related to the University's posts on Facebook, Twitter, and Instagram fail to plausibly state a claim for relief.

### 2. Sisco fails to allege that he was not provided an auxiliary aid in his Chinese history class as required by the ADA.

Under Title II of the ADA, a qualified individual with a disability is an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, **or the provision of auxiliary aids and services**, meets the essential eligibility requirements for the receipt of services or the participation in the programs or activities provided by a public entity." *Smith v. Bd. of Comm'rs of the La. Stadium & Exposition Dist.*, 385 F. Supp. 3d 491, 498 (E.D. La. 2019) (quoting 42 U.S.C. § 12131(2)) (emphasis added).

Accordingly, under the DOJ's administrative regulations, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, including applicants, participants, companions, and

16

members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). Auxiliary aids and services include, but are not limited to, qualified interpreters on-site or through video remote interpreting (VRI) services, notetakers, real-time computer aided transcription services, written materials, exchange of written notes, open and closed captioning, and/ or other effective methods of making aurally delivered information available to individuals who are deaf or hard of hearing. *Id*. at § 35.104.[9]

"In determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." *Id*. at § 35.160(b)(2). Nonetheless, a provided accommodation is not a violation of the ADA, even if not ideal, as long as it is reasonable and effective, and nothing in the ADA or its implementing regulations dictates that a disabled individual must be provided with the specific type of auxiliary aid that he or she requests. *See Wells v. Thaler*, 460 F. App'x 303, 313 (5th Cir. 2012). Accordingly, the Fifth Circuit has found that there is no ADA violation where a governmental entity provides an accommodation or auxiliary aid that is reasonable and effective even if the governmental entity does not provide the specific aid requested by the disabled individual. *See Wilson v. Tex. Dep't of Criminal Justice*, 2012

---

[9] Sisco does not indicate in his pleadings which specific provision of Title II he claims that the University violated, and instead generally asserts that the University violated the Rehab Act because it "discriminated against Plaintiff solely on the basis of his disability" and the ADA because it "discriminated against Plaintiff on the basis of his disability." First Am. Compl. pp. 11-12. Sisco's Amended Complaint, however, makes clear that the gravamen of his discrimination claim is based on the University's alleged failure to provide captioning in various contexts, which accordingly challenges the University's failure to provide an auxiliary aid. *See* First Am. Compl. pp. 4-7 [Doc. 14]; *see also Gil v. Winn-Dixie Stores, Inc.*, 993 F.3d 1266, 1271 n. 4 (noting that although the plaintiff did not indicate in his pleadings which provision of Title III he claimed the defendant was violating, the essence of his complaint was that the defendant had not provided an auxiliary aid to allow the plaintiff to fully and equally enjoy its website.

17

U.S. Dist. LEXIS 132932, *12 (E.D. Tex. Aug. 16, 2012) (construing *Wells*, 460 F. App'x at 313).

Here, Sisco alleges that he was not provided his requested auxiliary aid, open or closed captioning, but he does not allege that the University did not provide any auxiliary aid, such as a qualified interpreter, a note taker, or other written materials.[10] In fact, Sisco does not even specifically allege that he was not provided a "reasonable and effective" auxiliary aid, and that the denial of such an aid precluded his participation in class. Instead, he alleges only that he was not provided with one specific auxiliary aid, and that because he was allegedly not provided with that specific auxiliary aid, he missed relevant information in class.

The potential denial of a specific requested auxiliary aid in and of itself is not sufficient to state a claim under the ADA, however, and Sisco's allegations therefore fail to state a plausible claim for relief. Sisco has now amended his Complaint once already, and has steadfastly focused on pleading his claims with as few supporting facts as possible. His intentional failure to plead that he was not provided a necessary and reasonable auxiliary aid is fatal to his ADA claim.

---

[10] As reflected on the University's Student Disability Services website, the University does provide such auxiliary aids, including note takers, written materials, and interpreting services. See https://sds.olemiss.edu/interpreting-services/. While Sisco, as master of his Complaint, endeavors to plead around this issue entirely with regard to his claimed accessibility issues, even his Complaint reflects that the University provided him with a qualified interpreter for various campus events. *See* First Am. Compl. pp. 9, 10 [Doc. 14].

**B. Even if Sisco has alleged a violation of Title II, he has not alleged conduct that violated the Fourteenth Amendment.**

The second prong of the *Georgia* test requires the court to determine whether the alleged Title II violation also violated the Fourteenth Amendment.[11] Under the Equal Protection Clause, "[d]isabled persons are not a suspect class," and classifications on the basis of disability violate the Equal Protection Clause only "if they lack a rational relationship to a legitimate governmental purpose." *Smith v. Bd. of Comm'rs of La. Stadium & Exposition Dist.*, 372 F. Supp. 3d 431, 451 (E.D. Mar. 7, 2019). Under the Due Process Clause, a violation of Title II may also violate the Fourteenth Amendment when "it prevents people with disabilities" from exercising fundamental rights secured by the Due Process Clause. *Id.* (citing *Tennessee v. Lane*, 541 U.S. 509, 522 (2004)).

Here, Sisco has not alleged that the University's purported decisions lack a rational relationship to any legitimate governmental purpose, and the Fifth Circuit has declined to find college enrollment (much less captioning for television or social media platforms) a fundamental right protected by the Due Process Clause. *See Shaikh v. Tex. A&M Univ. Coll. of Med.*, 739 F. App'x 215, 225 (5th Cir. 2018). Accordingly, Sisco has not alleged conduct that violates both Title II and the Fourteenth Amendment.

---

[11] Some courts have held that a plaintiff's failure to plead a separate Fourteenth Amendment violation is sufficient in and of itself to find that the Fourteenth Amendment is not implicated by the Plaintiff's claims. *See Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1261 (W.D. Okla. 2017) (finding no alleged Fourteenth Amendment violation because complaint did not specifically allege a separate violation); *see also Bearden v. Oklahoma ex rel Bd. of Regents*, 234 F. Supp. 3d 1148, 1151 (W.D. Okla. 2017) (noting that where plaintiff does not assert a Fourteenth Amendment claim, "there is nothing to assess.").

### C. Absent alleged conduct that violates the Fourteenth Amendment, Sisco cannot show that Congress' attempted abrogation of sovereign immunity was otherwise valid.

For Congress to exercise its enforcement power under Section Five of the Fourteenth Amendment, "there must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Smith*, 372 F. Supp. 3d at 452. Even if Congress proscribes conduct that does not directly violate the Fourteenth Amendment, legislation is nonetheless a valid exercise of Congressional power under Section Five if this "congruence and proportionality" test is met. *Id*. In *Tennessee v. Lane*, the Supreme Court found that Title II "unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services," but expressly declined to determine whether that same rationale would apply to suits seeking "reasonable access to hockey rinks, or even to voting booths." 541 U.S. at 530.

Here, Sisco has failed to identify the Fourteenth Amendment rights he claims are implicated by the University's alleged failure to provide captioning on TVs in the Pavilion and School of Education, captioning on Instagram, Twitter, and Facebook, and captioning for video played during one of his classes and a related after-hours lecture. Sisco has not identified a narrow category of state action sufficient for the Court to find that Congress' attempted abrogation was otherwise valid even without a Fourteenth Amendment violation, and his ADA claims are therefore barred by the Eleventh Amendment.

**III. Sisco also has not stated a plausible disability discrimination claim under the Rehab Act.**

The sole difference between the ADA and the Rehab Act is in their separate causation standards, and courts within the Fifth Circuit have routinely subjected claims under either statute to identical analysis. *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 288 (5th Cir. 2005) ("The sole difference between the statutes lies in their causation requirements."); *Greer v. Richardson Ind. Sch. Dist.*, 472 F. App'x 287, 291 (5th Cir. 20120) (considering plaintiff's ADA and Rehab Act claims concurrently and referring "only to the ADA for brevity."). Accordingly, because Sisco has not stated a plausible discrimination claim under the ADA, his Rehab Act claim likewise fails.

**IV. The Court lacks subject matter jurisdiction over Sisco's captioning claims for televised content.**

Sisco's Amended Complaint bases his claims at least in part on NewsWatch, the University's student-run televised news broadcast, and "The Season," a televised documentary series regarding the University's athletic teams, both of which implicate the Twenty-First Century Communications and Video Accessibility Act of 2010 (the "CVAA"). Because those claims are based on televised content, Sisco must exhaust the CVAA's administrative remedy provisions before filing suit as to those claims. *Sierra v. Broward Cnty. Sch. Bd.*, 2017 U.S. Dist. LEXIS 62498, *13 (S.D. Fl. Aug. 19, 2017) (dismissing plaintiff's captioning claim for televised content for lack of subject matter jurisdiction pending plaintiff's exhaustion of administrative remedies); *see contra Sierra v. City of Hallandale Beach Fl.*, 904 F.3d 1343, 1349 (11th Cir. 2018) (declining to follow the court's reasoning in Broward County because not all plaintiffs who might have a cause of

action under the CVAA also have a cause of action under the ADA or Rehab Act). Because Congress has delegated to the FCC authority to address complaints involving compliance with the CVAA's closed-captioning requirements, which set forth Congress's most recent statement regarding the application of closed-captioning to televised programming, this Court should dismiss Sisco's claims related to televised content for lack of subject matter jurisdiction.

**CONCLUSION**

Despite Sisco's amendment, his Complaint still fails to adequately state any claim for relief. Sisco's cobbling together of a series of unrelated accessibility issues he claims to have encountered during his four-year enrollment with the University is insufficient to disguise the defects in his claims. Sisco lacks standing to pursue much of his requested injunctive relief, his ADA claim is barred by the Eleventh Amendment, and his Rehab Act claim fails to plausibly state a claim for relief. This Court should dismiss his Complaint in its entirety.

THIS, the 6th day of July 2021.

Respectfully submitted,

UNIVERSITY OF MISSISSIPPI
AND CHANCELLOR GLENN BOYCE

*/s/ J. Andrew Mauldin*
POPE S. MALLETTE. (MB NO. 9836)
J. ANDREW MAULDIN (MB NO. 104227)
ATTORNEYS FOR DEFENDANTS

22

OF COUNSEL:

MAYO MALLETTE PLLC
5 University Office Park
2094 Old Taylor Road
Post Office Box 1456
Oxford, Mississippi 38655
Telephone: (662) 236-0055
Facsimile: (662) 236-0035
Email:  pmallette@mayomallette.com
          dmauldin@mayomallette.com