**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI**

JOSHUA SISCO,

      Plaintiff,

                                    Case No 3:21-cv-059-DMB-RP

v.

UNIVERSITY OF MISSISSIPPI, and
GLENN BOYCE.

      Defendants.

## <u>RESPONSE IN OPPOSITION TO MOTION TO DISMISS AMENDED COMPLAINT</u>

Ole Miss has moved to dismiss Joshua Sisco's First Amended Complaint. Primarily, it argues that it has Eleventh Amendment immunity from suit. Alternatively, the university argues that Mr. Sisco has failed to state a claim upon which relief can be granted and/or that he must exhaust administrative remedies. Finally, it argues that he lacks Article III standing to seek injunctive relief for some of his claims. As explained below, none of the contentions have merit.

## I. Background

Mr. Sisco is deaf, and this case arises from his years-long battle with Ole Miss, which has systematically refused to provide reasonable accommodations for his disability under the Americans with Disabilities Act and the Rehabilitation Act. He alleges that he repeatedly asked Ole Miss officials to provide captions for various school-produced content or enable closed captions for third-party-produced content. Doc. 14. In particular, he complains that the following university-provided services lack or lacked captions: (1) Ole Miss's social media videos; (2) TVs in the university's common areas, such as "The Pod" and "The Pavilion," (3) Ole Miss's "NewsWatch" program, and (4) videos played in Mr. Sisco's Chinese history class. *Id.* Mr. Sisco seeks various remedies, including damages and injunctive relief. *Id.*

## II. Standard of Review

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. The purpose of this requirement is "to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015). The party filing a motion to dismiss under Rule 12(b)(6) bears a "heavy burden" to "show that there is no possibility that plaintiff would be able to establish a cause of action." *Lewis v. Fresne*, 252 F.3d 352, 357 (5th Cir. 2001). In evaluating such motions, the court "must accept all well-pleaded facts as true, and ... view them in the light most favorable to the plaintiff." *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 899 (5th Cir. 2019). "All questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Id.*

The analysis is largely the same for Article III standing. To litigate in federal court, a plaintiff must allege an injury in fact, traceable to the defendants, and redressable by the court. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (May 24, 2016). However, the court must "assume the [plaintiff's] view of the facts to be true for purposes of standing." *Texas v. Rettig*, 968 F.3d 402, 412 (5th Cir. 2020); *Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("For purposes of ruling on a motion to dismiss for want of standing, … courts must … construe the complaint in favor of the complaining party."). Courts "should think long and hard before dismissing" a claim of discrimination, because "[t]he badge of inequality and stigmatization conferred by [disability] discrimination is a cognizable harm in and of itself providing grounds for standing." *See Moore v. USDA*, 993 F.2d 1222, 1223–24 (5th Cir. 1993); *see also Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) ("Given the remedial purpose underlying the ADA, courts should resolve doubts about [justiciability] in favor of disabled individuals.").

## III.    Argument

Ole Miss inexplicably dedicates 12 pages to its Eleventh Amendment argument.  Doc. 17 at 8–20.  The university is apparently unaware of longstanding caselaw holding that States receiving federal funds under Section 504 of the Rehabilitation Act waive their Eleventh Amendment immunity, rendering wholly irrelevant any immunity questions under the Americans with Disabilities Act.  *See Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287–89 (5th Cir. 2005) (en banc) (concluding that Louisiana was not entitled to sovereign immunity under the ADA, because it waived immunity under Section 504, which contains "exactly the same" rights and remedies as the ADA).  In addition, Ole Miss contends that Title II of the ADA does not cover website content, but the DOJ has stated otherwise, and its position is entitled to deference.  Moreover, the university ignores the long line of cases applying Title II to public entities' internet communications and instead relies on caselaw interpreting Title III (which does not govern public entities).  Ole Miss also invokes the Communications and Video Accessibility Act, but courts have uniformly held that this statute in no way implicates claims brought under the ADA or Section 504.  *See Sierra v. City of Hallandale Beach, Fla.*, 904 F.3d 1343, 1349 (11th Cir. 2018).  Finally, Ole Miss also raises Article III standing arguments, which are premature at the motion-to-dismiss stage and, in any event, lack merit.

### A.  Ole Miss has waived sovereign immunity because it receives federal funds.

Ole Miss argues that it has sovereign immunity from suit under the Eleventh Amendment.  Doc. 17 at 8–20.  As an initial matter, Eleventh Amendment immunity bars only suits for *damages* and has no application where a party seeks injunctive relief against a state officer in his official capacity.  *See Ex parte Young*, 209 U.S. 123, 189 (1908); *Ganther v. Ingle*, 75 F.3d 207, 209 (5th Cir. 1996).  Mr. Sisco seeks both damages and injunctive relief.  Doc. 14.  As explained below,

Ole Miss is not immune from damages claims under the ADA, because it has waived sovereign immunity by receiving federal funds under Section 504.

In *Pace v. Bogalusa City School Board*, the Fifth Circuit, sitting *en banc*, denied Louisiana's request for sovereign immunity under the ADA because the state waived its immunity under Section 504 of the Rehabilitation Act by receiving federal funds. 403 F.3d at 287–89. The court explained that the rights and remedies under Section 504 and the ADA are "exactly the same" when for a plaintiff complains of architectural barriers. *Id.* at 287. The court noted that the "sole difference" between the ADA and Section 504 is that the latter has a heightened causation standard, but this heightened standard is implicated only where there is a claim of disparate treatment. *See id.* The Fifth Circuit later extended this principle to suits alleging the denial of a reasonable accommodation, explaining that, where a public entity fails to meet its "affirmative obligation" to make a reasonable accommodation for a disabled person, "the cause of that failure is irrelevant." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005) ("Because Louisiana has waived its sovereign immunity from actions under § 504 of the Rehabilitation Act, … we need not address at this juncture the issue of abrogation under Title II of the ADA, because the rights and remedies under either are the same for purposes of this case.").

Here, Ole Miss does not dispute that "it is a recipient of federal funds," doc. 14 at 11, or that "State entities that accept federal funding knowingly and voluntarily waive their sovereign immunity to suit under § 504 of the Rehabilitation Act." *Campbell v. Lamar Inst. of Tech.*, 842 F.3d 375, 379 (5th Cir. 2016). To the contrary, Ole Miss concedes that Mr. Sisco's Section 504 claim "claim does not implicate the University's Eleventh Amendment immunity." Doc. 17 at 9. And because Mr. Sisco alleges that he was denied reasonable accommodations, the "rights and remedies" under Section 504 and the ADA "are the same for purposes of this case." *See Bennett-*

*Nelson*, 431 F.3d at 455. Accordingly, this Court "need not address" Ole Miss's Eleventh Amendment arguments. *See id.*; *see also Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 224 (5th Cir. 2018) (Because Shaikh has stated a claim under Section 504, we conclude, for purposes of [Eleventh Amendment immunity], that the same conduct is a violation of Title II of the ADA."); *Hammond v. Univ. of S. Mississippi*, No. 2:18-CV-150-KS-MTP, 2018 WL 5988353, at *3 (S.D. Miss. Nov. 14, 2018) ("[T]he Court declines to … address whether Title II of the ADA constitutes a valid abrogation of sovereign immunity with respect to Plaintiff's ADA claim, having concluded that [the] identical Section 504 claim is not barred by sovereign immunity.").

Given this longstanding precedent, it truly "is a mystery" why Ole Miss has "chose[n] to pursue the question of Eleventh Amendment abrogation under Title II of the ADA." *See Campbell*, 842 F.3d at 379. The university argues that the Court "should still first consider the [its] immunity defense where the difference in causation standards is applicable to the facts of the case," doc. 17 at 9, but it makes no effort to explain why different causation standards would apply here. This is unsurprising, because, as already explained, "there is no question that the complaint claims the University's failure to provide the demanded accommodations is the sole cause of the alleged denial of benefits." *See Bennett-Nelson*, 431 F.3d at 455 ("If the accommodation is required the defendants are liable simply by denying it."). In short, Fifth Circuit precedent squarely forecloses any Eleventh Amendment defense here. *See Pace*, 403 F.3d at 287–89; *Bennett-Nelson*, 431 F.3d at 454–55; *Campbell*, 842 F.3d at 379; *Shaikh*, 739 F. App'x at 224.

Even assuming Ole Miss could somehow overcome *Pace* and its progeny, every circuit court that has considered the question has held that Title II of the ADA validly abrogated the States' sovereign immunity in the educational context. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555 (3d Cir. 2007) ("As applied to education, Title II is a congruent and

proportional means of preventing and remedying the unconstitutional discrimination that Congress found to exist both in education and in other areas of governmental services, many of which implicate fundamental rights."); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006) ("We are similarly persuaded that Title II's prophylactic measures are justified by the persistent pattern of exclusion and irrational treatment of disabled students in public education, coupled with the gravity of the harm worked by such discrimination."); *Ass'n for Disabled Americans, Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 959 (11th Cir. 2005) (concluding that Title II is a "congruent and proportional" response to the "long history of state discrimination against students with disabilities," which limits their "future ability to exercise and participate in the most basic rights and responsibilities of citizenship"); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005) (concluding that "Title II of the ADA is valid § 5 legislation, at least as it applies to public higher education," because "it is more likely that disability discrimination … public education programs will be unconstitutional than discrimination in … public employment," and because Title II's "remedial measures … are likely less burdensome to the States than those employed in Title I").[1] If the Court is inclined to consider the question, it should follow their lead. Indeed, the Eleventh Circuit recently held that Title II abrogates States' immunity with regard to captioning video content. *Nat'l Ass'n of the Deaf v. Fla.*, 980 F.3d 763, 773 (11th Cir. 2020) (holding that requiring a legislative body to "add[] captioning to legislative videos" is "a proportionate" remedy under Title II).

### B. Mr. Sisco states plausible claims under both the ADA and Section 504.

Ole Miss concedes that the legal analysis of claims under the ADA and Section 504 is "identical." Doc. 17 at 21; *see also Pace*, 403 F.3d at 287–89; *Bennett-Nelson*, 431 F.3d at 454–

---

[1] The Fifth Circuit declined to consider this question in *Pace*, 403 F.3d at 287 ("[W]e do not address whether … [*Tennessee v.*] *Lane* extends to … access to public education.").

55.   However, it raises four arguments attacking the plausibility of Mr. Sisco's claims.   First, it maintains that Title II and Section 504 do not cover its social media videos.   Doc. 17 at 10–16. Second, the university argues that Mr. Sisco fails to "identify specifically what information is inaccessible."   *Id.* at 13.   Third, Ole Miss contends that it cannot be held liable for uploading inaccessible content to a third party's website.   *Id.* at 14–16.   Fourth, it argues that Mr. Sisco "fails to allege that he was not provided an auxiliary aid in his Chinese history class."   *Id.* at 16–18. These arguments are all meritless.

### 1.   Title II and Section 504 cover Ole Miss's social media videos.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."   42 U.S.C. § 12132.   The Department of Justice—the agency charged with promulgating regulations interpreting this title—has taken an expansive view of Title II, concluding that it "applies to *all* services, programs, and activities provided or made available by public entities."   28 C.F.R. § 35.102 (emphasis added).   More to the point, Title II "applies to anything a public entity does." 28 C.F.R. § Pt. 35, App. B.   Circuit courts have deferred to the DOJ's interpretation.[2]

Multiple courts have applied Title II and Section 504 as requiring captions for video content on public entities' online communications.   For example, the District of Massachusetts concluded that Section 504 applied to Harvard University's failure "to provide timely, accurate

---

[2] *Bahl v. Cty. of Ramsey*, 695 F.3d 778, 787–88 (8th Cir. 2012) ("[DOJ] regulations confirm that 'title II applies to anything a public entity does.'"); *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001) ("[T]he ADA's broad language brings within its scope 'anything a public entity does.'"); *Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir. 1998) ("[W]e find that the phrase 'services, programs, or activities' encompasses virtually everything that a public entity does."); *Yeskey v. Com. of Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd sub nom.*, 524 U.S. 206 (1998) ("This broad language is intended to 'appl[y] to anything a public entity does.'").

captioning of the audio and audiovisual content that Harvard makes available online to the general public for free." *Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 53 (D. Mass. 2019). Similarly, the District of Maryland denied a motion to dismiss where the plaintiff alleged that a public university failed to provide captions for information on its "athletic websites" and for audio "projected into the stadium bowls and concourse areas" of the university's athletic facilities. *Innes v. Bd. of Regents of Univ. Sys. of Maryland*, 29 F. Supp. 3d 566, 571 (D. Md. 2014). The court later denied the university's motion for summary judgment. *See Innes v. Bd. of Regents of the Univ. Sys. of Maryland*, No. CIV.A. DKC 13-2800, 2015 WL 1210484, at *12 (D. Md. Mar. 16, 2015) ("There is a genuine dispute of material fact as to whether captioning live and pre-produced content on UMTerps.com would be unduly burdensome."); *cf. Reininger v. Oklahoma*, 292 F. Supp. 3d 1254, 1261 (W.D. Okla. 2017) ("Defendants concede that Plaintiff has stated a Title II claim based on their "failure to caption streaming video of legislative sessions."). Courts have reached the same conclusion when public entities' websites are alleged to be inaccessible to the blind or visually impaired. *See Payan v. Los Angeles Cmty. Coll. Dist.*, No. 2:17-cv-01697-SVW-SK, 2019 WL 2185138, at *11 (C.D. Cal. May 21, 2019), *report and recommendation adopted,* No. 2:17-cv-01697-SVW-SK, 2019 WL 3298777 (C.D. Cal. July 22, 2019); *Hindel v. Husted*, No. 2:15-cv-3061, 2017 WL 432839, at *5 (S.D. Ohio Feb. 1, 2017; *Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1366, 1377 (N.D. Ga. 2002).

Despite this caselaw and DOJ's broad regulations, Ole Miss argues that its communications through social media websites are not covered by Title II. Notably, Ole Miss does not dispute that Title II applies to videos played in Mr. Sisco's Chinese history class, televisions displayed in Ole Miss's common areas, or NewsWatch. Instead, the university's coverage argument is directed

solely at social media videos. As explained below, the argument has no merit, because the there is no "social media" exception to Title II.

In support of its coverage argument, Ole Miss primarily contends that "[t]he text of the ADA … does not specifically reference internet accessibility." Doc. 17 at 11. But courts have repeatedly rejected similar arguments. For example, the petitioners in *Pennsylvania Department of Corrections v. Yeskey* argued that prisons were not covered under Title II because "the statute's statement of findings and purpose … does not mention prisons and prisoners." 524 U.S. 206, 211 (1998). The Supreme Court unanimously rejected this as "irrelevant," explaining that "the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity," but rather "[i]t demonstrates breadth." *Id.* at 212; *see also Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1751 (2020) ("[I]n the context of an unambiguous statutory text, whether a specific application was anticipated by Congress is irrelevant."). The Fifth Circuit, sitting *en banc*, reached the same conclusion in *Frame v. City Arlington*, where it concluded that sidewalks were a "service, program, or activity" under Title II, even though sidewalks aren't mentioned in the statutory text. 657 F.3d 215, 225 (5th Cir. 2011) (en banc) (citing *Yeskey*, 524 U.S. at 212).

Indeed, Ole Miss concedes that Title II covers "all of the operations of ... a local government." Doc. 17 at 11 (quoting *Frame*, 657 F.3d at 225). Because it cannot seriously dispute that creating and posting social media videos are part "of the operations" of Ole Miss, *see id.*, the university raises various red herrings and cites inapposite caselaw interpreting Title III, which applies only to "public accommodations." The Court should look unfavorably on these "hair-splitting arguments," because Title II "prohibits all discrimination by a public entity, regardless of the context." *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir.

1997).  Social media content is simply one of the many "services, programs, or activities" that Ole Miss provides.  *See* 42 U.S.C. § 12132; 28 C.F.R. § Pt. 35, App. B.

Title II and Section 504 are clear, but to the extent there is any ambiguity, courts "do not simply impose [thei]r own construction" on the statutes.  *See Frame*, 657 F.3d at 224.  Instead, courts "refer to the responsible agency's reasonable interpretation of that statute." *Id.* at 225.  And here, "Congress directed the [DOJ] to elucidate Title II with implementing regulations," which means that "DOJ's views at least would 'warrant respect' and might be entitled to even more deference." *Id.* (quoting *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598–99 (1999) and citing *Alexander v. Choate*, 469 U.S. 287, 305 n.24 (1985), and *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)).  Relevant here, the DOJ has explicitly stated in its Guidance Document interpreting its regulations that "[p]ublic entities that … communicate with their constituents or provide information through the Internet must ensure that individuals with disabilities have equal access to such services or information." 28 C.F.R. § Pt. 35, App. A.  Because social media videos are used by public entities to "communicate with their constituents or provide information," they are covered by Title II and Section 504. *See id.*[3]

The DOJ's interpretation is entitled to deference.  In *Frame*, the Fifth Circuit found it unnecessary to decide how much deference to give to the DOJ's interpretation, because it "corroborate[d] [the court's] own analysis."  657 F.3d at 235.  But if this Court is conflicted or believes the statute is ambiguous as to captioning internet content, this Court should conclude that

---

[3] Of course, public entities need not provide accommodations that "would result in an undue financial and administrative burden or a fundamental alteration in the nature of the programs, services, or activities being offered," 28 C.F.R. § Pt. 35, App. A, but Ole Miss does not argue that adding captions to its video content would impose an undue burden.  Even if it did argue undue burden, this is an affirmative defense—a fact-intensive question not suited for a motion to dismiss. *See Frame*, 657 F.3d at 233 ("If the City can show that making its newly built and altered sidewalks accessible would have been unreasonable when those sidewalks were built or altered, the City would be entitled to an affirmative defense.").

the DOJ's interpretation is entitled to deference under *Chevron*, 467 U.S. at 843–44. Under *Chevron*, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chamber of Com. v. DOL*, 885 F.3d 360, 379 (5th Cir. 2018). Applied here, this Court must defer to the DOJ's interpretation that Title II requires public entities to provide "equal access" when they communicate "through the Internet," 28 C.F.R. § Pt. 35, App. A, so long as this interpretation is "reasonable," *see Chamber of Com.*, 885 F.3d at 379. In conducting this analysis, the Court must not second-guess the DOJ or "substitute [its] own judgment for a reasonable alternative." *Garcia-Carias v. Holder*, 697 F.3d 257, 263 (5th Cir. 2012). Instead, the Court must uphold the DOJ's interpretation unless it is "arbitrary, capricious or manifestly contrary to the statute." *Alenco Commc'ns, Inc. v. F.C.C.*, 201 F.3d 608, 619 (5th Cir. 2000).

Here, it's perfectly "reasonable" to interpret Title II as applying to public entities' communications with the public through the Internet. *See Chamber of Com.*, 885 F.3d at 379. For example, if the Ole Miss football held a pep rally on campus, no one would dispute that Title II would apply to the pep rally and that any disabled person who requested a reasonable accommodation to enjoy the pep rally would be entitled to one. But under Ole Miss's reading, if the university posted a video of that same pep rally to YouTube, Title II no longer applies. That is absurd. The DOJ has recognized that people are increasingly living their lives virtually and that disabled people need accommodations in that virtual world. This position is eminently reasonable and entitled to deference. *See Chevron*, 467 U.S. at 843–44.

Ole Miss is correct that although the DOJ has "generally taken the position that the ADA does apply to the internet," it has not yet "issue[d] any rules and regulations regarding internet accessibility." Doc. 17 at 11 n.6 (citing *Price v. City of Ocala*, 375 F. Supp. 3d 1264, 1270 (M.D.

Fla. 2019). But this is irrelevant, because agencies are entitled to the same level of deference when interpreting their own regulations. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is … controlling unless plainly erroneous or inconsistent with the regulation."). The Supreme Court reinforced this principle (known as "*Auer* deference") in *Kisor v. Wilkie*, explaining that courts defer to agencies' "reasonable readings of genuinely ambiguous regulations" when the interpretation is an "authoritative" or "official" position of the agency that "implicate[s] its substantive expertise" and "reflect[s] fair and considered judgment." 139 S. Ct. 2400, 2408, 2416–18 (2019) (internal quotations omitted). The DOJ's Title II guidance is unquestionably its "official position" on this issue. *See id.* at 2416. And because the Guidance responds to numerous comments made during the rulemaking process, it is also "fair and considered judgment." *See id.* at 2417; 28 C.F.R. § Pt. 35, App. A. Finally, given that DOJ is the agency Congress tasked with enforcing Title II, its interpretations of its regulations clearly "implicate its substantive expertise." *Kisor*, 139 S. Ct. at 2417. Thus, *Auer* deference is appropriate here.[4]

Ole Miss needlessly creates confusion by citing cases applying Title III—which covers public accommodations—instead of Title II—which covers public entities. For example, it relies heavily on *Gil v. Winn-Dixie Stores, Inc.*, 993 F.3d 1266, 1271 (11th Cir. 2021), a case from the Eleventh Circuit involving a grocery store, not a public university.[5] But as explained in *Price v. City of Ocala, Florida* (a case Ole Miss cites heavily), case law interpreting Title III "is largely inapposite to Title II website cases." 375 F. Supp. 3d 1264, 1271 (M.D. Fla. 2019). The court explained that Title II is more expansive in the Internet context than Title III "because there is no requirement that a violation be tied to a physical location." *Id.* at 1272. That is, "requiring a nexus

---

[4] At a minimum, the DOJ's view "warrant[s] respect." *See Frame*, 657 F.3d at 224.
[5] Though not relevant here, the *Winn-Dixie* decision is currently pending *en banc* review.

between a governmental website and an impediment to accessing a physical, brick-and-mortar location makes no sense under Title II," because it "has no statutory requirement that a violation be connected to a physical location." *Id.* at 1273.

Finally, Fifth Circuit law is clear that "any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Inclusive Communities*, 920 F.3d at 899. This is especially true given the ADA's remedial purpose, which requires that it "be construed liberally" to afford people with disabilities "equal access." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001). "The ADA is a 'broad mandate' of 'comprehensive character' and 'sweeping purpose' intended 'to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.'" *Frame*, 657 F.3d at 223 (quoting *PGA Tour,* 532 U.S. at 675); *see also Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 234 (5th Cir. 2001) (concluding that claim was covered by ADA in light of its "broad, remedial framework"). In today's day and age when life is often experienced through the Internet, excluding social media videos from Title II and Section 504 would fly in the face of their "broad mandate" and "sweeping purpose." *See Frame*, 657 F.3d at 223.

## 2. Rule 12(b)(6) does not require Mr. Sisco to catalog every allegedly inaccessible social media video.

Ole Miss next argues that, even if Title II and Section 504 apply to social media videos, Mr. Sisco "has still failed to state a plausible a claim" because he must "identify specifically what information is inaccessible." Doc. 17 at 13. This argument is at odds with Rule 8's requirement that a complaint provide merely a "short and plain statement of the claim." Fed. R. Civ. P. 8. The purpose of pleading is "to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 498 (5th Cir. 2015).

Mr. Sisco's complaint gives Ole Miss fair notice that most of its social media videos are not captioned. At this stage, no more detail is required.

Ole Miss relies on *Price*, 375 F. Supp. 3d at 1271–75, but that case has no application here. First and foremost, Ole Miss is wrong that "the court held that [the plaintiff] had failed to 'specify precisely what documents were inaccessible.'" Doc. 17 at 14 (quoting *Price*, 375 F. Supp. 3d at 1267 n. 2). *Price* was decided on standing grounds, so any discussion of Rule 12(b)(6) is dicta. *See Sierra v. City of Hallandale Beach, Fla.*, 996 F.3d 1110, 1114–15 (11th Cir. 2021) ("Our precedent is clear that a court cannot rule on the merits of a case after finding that the plaintiff lacks standing. … Therefore, the district court's statement about intentional discrimination was merely dicta—not a ruling on the merits."). In fact, the court itself acknowledged that the merits of the claim were "not currently before the Court." *Price*, 375 F. Supp. 3d at 1277 n.16.

Second, even assuming *Price*'s discussion of the merits had any force, it is easily distinguishable. The *Price* court noted the plaintiff's failure to identify "what precise documents on the City's website" were inaccessible. *Id.* at n.2. The plaintiff had "cite[d] more than a dozen links to the City's website … but never state[d] that the documents in those links are inaccessible as opposed to implying that those links are representative of the type of information available on the City's website." *Id.* at n.14. By contrast, Mr. Sisco has identified specific video content that is inaccessible, including episodes of "The Season" and a motivational video narrated by Mr. Sisco's friend for the Ole Miss-Alabama game in October 2020. Doc. 14 at 5. In addition, he alleges that "very few" of the videos that Ole Miss posts to social media are captioned. *Id.* at 4. This is more than enough at the pleading stage. *See Harvard Univ.*, 377 F. Supp. 3d at 54 (denying motion to dismiss where complaint alleged that "[o]nly a fraction of the online content that Harvard makes available has timely, accurate captioning"). To the extent Ole Miss demands a full

14

accounting of every inaccessible video that Mr. Sisco has ever encountered on its social media platforms, this is absurd and goes far beyond the Federal Rules' notice pleading standards. *See Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (a complaint "need not contain detailed factual allegations"). That is what discovery is for.

### 3. Mr. Sisco's allegations are aimed at Ole Miss's conduct and no one else's.

Ole Miss argues that Mr. Sisco's "real complaint is that Facebook, Twitter, and Instagram have not provided him with a necessary auxiliary aid to access content streamed on their respective apps or websites." Doc. 17 at 16. Nonsense. Ole Miss makes a choice when it uploads content to third-party social media sites: it can either upload videos without captions, or it can take the extra step of adding captions to videos before uploading them. Mr. Sisco has alleged that "Ole Miss has the full capability of adding captions to any and all video content, including videos it uploads to social media." Doc. 14 at 3. Ole Miss is *choosing* to upload videos that are inaccessible to deaf people. Facebook, Twitter, and Instagram are mere vessels of the inaccessible video content Ole Miss has chosen to upload.

Ole Miss relies on *Ivy v. Williams*, 781 F.3d 250, 255 (5th Cir. 2015), but that decision was vacated by the Supreme Court in *Ivy v. Morath*, 137 S. Ct. 414 (2016).[6] In other words, Ole Miss has cited a decision that *no longer exists*. In any event, *Ivy* is inapposite. That case involved an allegedly inaccessible driver-education program provided by a *private company*. *Ivy*, 781 F.3d at 252. The Fifth Circuit held that the Texas Education Agency could not be liable under Title II, because it "d[id]not provide any portion of driver education; it merely license[d] driver education schools," and because its policies and regulations had "not caused" the inaccessibility issues. *Id.*

---

[6] The Supreme Court vacated *Ivy* under the rule established in *United States v. Munsingwear, Inc.*, which held that "in dealing with a civil case from a court in the federal system which has become moot while on its way [to the Supreme Court] or pending [its] decision on the merits," the Court should "reverse or vacate the judgment below and remand with a direction to dismiss." 340 U.S. 36, 39 (1950).

at 256.  By contrast, Mr. Sisco clearly alleges that a *public entity* is producing and uploading videos without captions and that doing so violates Title II.  *See id.*  Thus, even though the videos are ultimately displayed by third parties, Ole Miss unquestionably "caused" the lack of captioning, because it created the videos and uploaded them without captions.  *See id.*

The District of Massachusetts rejected a nearly identical argument in *Harvard University*, 377 F. Supp. 3d at 63.  There, the university argued that it could not be held liable for uncaptioned content posted on "websites hosted by third parties, including Harvard on YouTube, Harvard on iTunes U; and Harvard on SoundCloud."  *Id*.  The district court denied Harvard's motion to dismiss, explaining that Harvard's level of control over the content and the reasonableness of requiring captions were questions of fact that could not be resolved on a motion to dismiss:

> It may be that Harvard does not arrange for inaccessible content to appear on these platforms, or that Harvard lacks control over how content is displayed on third-party websites, or that captioning would not provide meaningful access to content on third-party websites for deaf and hard of hearing individuals, or that requiring captioning would fundamentally alter the nature of the service or result in an undue burden. Those are questions raised by Harvard's affirmative defenses. The court cannot make such determinations in the absence of a more developed factual record.

*Id.* at 63–64 ("Plaintiffs have not alleged that Harvard functions as a regulator of its websites and platforms. … And, in the absence of a factual record, the role Harvard plays in connection with content that Harvard itself may not create or produce is a matter of conjecture.").  At this stage, the Court must accept as true the allegation that Ole Miss is causing the inaccessibility.

### 4. Whether alternative auxiliary aids were available in Mr. Sisco's Chinese history class is irrelevant at the motion-to-dismiss stage.

Ole Miss next tries to leapfrog the pleading stage and dive straight into the merits.  It contends that Mr. Sisco fails to state a claim based on the events in his Chinese history class because "he does not allege that the University did not provide any auxiliary aid, such as a qualified interpreter, a note taker, or other written materials."  Doc. 17 at 18.  But Mr. Sisco does not need

to allege every conceivable accommodation that the university *didn't* provide. In fact, Ole Miss admits that "[i]n determining what types of auxiliary aids and services are necessary, a public entity shall give primary consideration to the requests of individuals with disabilities." 28 C.F.R. § 35.160(b)(2). The complaint could not be more clear that captions were Mr. Sisco's preferred accommodation. *See id.* Moreover, Mr. Sisco alleges that Ole Miss essentially *conceded* that captioning the videos were reasonable, but that his professor simply failed, over and over, to have Student Disability Services caption them. Doc. 14 at 8 (alleging that school officials admonished Mr. Sisco's professor for failing to provide captions).

To be sure, the ADA does not always require "that a disabled individual must be provided with the specific type of auxiliary aid that he or she requests." Doc. 17 at 17. But whether a disabled person's preferred aid should be provided is, at bottom, a question of whether the accommodation is "reasonable"—a factual issue that cannot be resolved at the motion-to-dismiss stage. *See Cadena v. El Paso Cty.*, 946 F.3d 717, 724 (5th Cir. 2020) ("[T]he County was obligated to provide [plaintiff] with reasonable accommodations that allowed her to access its services. [Plaintiff] has pointed to several different types of requests that the County denied. A reasonable jury could find that some, or all, of these requests were reasonable, and that the County violated the ADA by refusing to accommodate [her]."). It is thus no surprise that Ole Miss cites a case involving a motion for summary judgment, not a motion to dismiss. *See* doc. 17 at 17 (citing *Wells v. Thaler*, 460 F. App'x 303, 304 (5th Cir. 2012)). In *Wells*, the court examined *evidence in the record* to determine whether the defendant's proffered accommodation—though not the one plaintiff requested—was reasonable. *See* 460 F. App'x at 312–13 ("The record indicates that Wells was provided same-session library visits with an inmate of his choosing who would read to him and otherwise assist him in preparing filings. … Although the law library did not provide

17

Wells his requested accommodations, … the existing accommodations were more than sufficient … [for] meaningful access to the law library."). Ole Miss will have ample time to dispute the reasonableness of Mr. Sisco's preferred accommodations. Now is not that time.

### C. The CVAA does not apply to this case.

Ole Miss haphazardly tosses in an argument under the Twenty-First Century Communications and Video Accessibility Act (CVAA), U.S.C. § 610, *et seq*, arguing that Mr. Sisco must exhaust some of his claims with the Federal Communications Commission. Doc. 17 at 21–22. As an initial matter, Mr. Sisco's claims are not "based on televised content," doc. 17 at 21, because his complaint alleges that he tried to watch "The Season" and NewsWatch on *Facebook*, not on TV. *See* doc. 14 at 4 ¶ 37, at 7 ¶ 61. More importantly, every court to have considered this argument has rejected it. Ole Miss cites *Sierra v. Sch. Bd. of Broward Cty.*, No. 16-CV-63021, 2017 WL 1423956, at *4 (S.D. Fla. Apr. 20, 2017), which held that the FCC has "exclusive jurisdiction" over any complaints about the captioning of video programming. But the Eleventh Circuit overruled this decision in no uncertain terms just a year later in *Sierra v. City of Hallandale Beach, Fla.*, 904 F.3d 1343 (11th Cir. 2018), so it no longer carries any force.

The *Hallandale Beach* decision flatly rejected the argument that the CVAA "grants the FCC exclusive jurisdiction over issues concerning closed captioning of videos streamed on the internet." *Id.* at 1348–49 (emphasis omitted). Instead, the court held that exhaustion with the FCC of a captioning-based complaint is required if, and only if, a plaintiff brings a claim under 47 U.S.C. § 613(j). *Id.* at 1349 ("Congress granted the FCC 'exclusive jurisdiction with respect to any complaint *under this section*.'") (quoting 47 U.S.C. § 613(j)). Nothing stops a plaintiff from asserting captioning-based complaints under the ADA or Section 504. *Id.* ("Whereas issues concerning closed captioning of video content delivered over the internet could arise in many

18

contexts … issues concerning complaints under § 613(j) can arise in one place only: § 613(j) itself. In short, § 613(j) does nothing more than prevent someone wanting to bring a complaint under that section from doing so anywhere other than before the FCC.").

The Ninth Circuit and the District of Massachusetts have reached the same conclusion. *See Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.*, 742 F.3d 414, 428–29 (9th Cir. 2014) ("Even if the [CVAA] evinced Congress's intent to preempt the field of closed captioning for *television* programming, the CVAA and the FCC's 2012 online captioning rules left ample room for state laws to supplement the federal regulatory scheme for *online* Internet closed captioning."); *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F. Supp. 2d 196, 208 (D. Mass. 2012) ("[T]he CVAA does not cover all of the streaming video programming and other services that are the subject of Plaintiffs' ADA claim."). This Court should follow their lead and hold that the CVAA has no relevance here, because Mr. Sisco has not asserted a claim under that statute. Put another way, although "the FCC undoubtedly has expertise on closed-captioning requirements, its charge under the CVAA bears not one iota on what constitutes a violation under the Rehabilitation Act or ADA." *Hallandale Beach*, 904 F.3d at 1351–52.

### D.  Ole Miss concedes that Mr. Sisco has standing to seek injunctive relief.

A plaintiff must have Article III standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Relevant here, standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At this early stage, the plaintiff's burden is light, and a court must "assume the [plaintiff's] view of the facts to be true for purposes of standing," *Rettig*, 968 F.3d at 412, and "construe the complaint" in his favor, *Warth*, 422 U.S. at 501. As the case

progresses, the burden to prove standing becomes more onerous. *See In re Deepwater Horizon*, 739 F.3d 790, 799 (5th Cir. 2014) ("[T]he standard used to establish [standing] is not constant but becomes gradually stricter as the parties proceed through the successive stages of the litigation.") (internal quotations omitted). Mr. Sisco easily satisfies his burden here.

First and foremost, Ole Miss concedes that Mr. Sisco has Article III standing to pursue injunctive relief. In particular, the university "concede[s] he has standing to pursue at least *some* [injunctive] relief" with respect to his Chinese history class and Ole Miss's social media videos. Doc. 17 at 7. Based on this concession, the Court should stop there and reject any attempt to parse out *which types* of injunctive relief the Court may ultimately be inclined to award. It is far too early for that. *See Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, No. 02 06CV1064, 2007 WL 1007968, at *9 (W.D. Pa. Mar. 30, 2007) (denying motion to dismiss claims for injunctive relief because "[e]ven if this Court were to reject the particular injunctive relief requested by Plaintiffs, this Court would still be entitled to grant Plaintiffs injunctive relief in some other form"); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 550 (D.N.J. 2004) ("This Court is loathe at this stage in the proceedings to curtail its broad equity powers to fashion the most complete relief possible. … [W]hile this Court may ultimately agree … that claims for injunctive relief are inappropriate, dismissal at this stage of the proceedings would be premature.").

Second, Mr. Sisco is not seeking a preliminary injunction, so there is no need for the Court to make any factual findings at this time. *See Irshad Learning Ctr. v. Cty. of DuPage*, 804 F. Supp. 2d 697, 719 (N.D. Ill. 2011) (denying motion to dismiss claim for injunctive relief as "premature" because plaintiff "ha[d] not filed a motion for a preliminary injunction or a temporary restraining order"); *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 361 (2d Cir. 2003) ("To the degree that defendants challenge the factual underpinnings of the allegations

made by plaintiffs in support of their standing to bring suit, the argument is premature.");
*Endurance Am. Ins. Co. v. Cheyenne Partners, LLC*, No. 6:20-CV-00571, 2020 WL 6483103, at
*3 (W.D. La. Aug. 21, 2020) ("Because the request for injunctive relief has not been formally
placed before the court in an appropriate procedural posture for adjudication, it would be improper
for this Court to hold that [Plaintiff] is not entitled to any injunctive relief that might be
available.").  It makes little sense for the Court speculate about what precise injunctive relief it
may or may not have the power to grant at some future point in time, when there is no motion
asking the Court for any immediate relief.

Third, it is especially premature to dismiss injunctive-relief claims when, as here, the
plaintiff has "live damages claim[s] that will support injury-in-fact."  *See Laurens v. Volvo Cars
of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017).  As explained above, Ole Miss is not entitled
to sovereign immunity, and Mr. Sisco has stated plausible damages claims under the ADA and
Section 504.  If the Court agrees that Mr. Sisco's damages claims should go forward, then "further
proceedings will be necessary, and that would be the best time to explore whether [he] also has
standing to pursue [certain] type[s] of injunctive relief."  *Id.*  And, if necessary, the "standing
inquiry can be revisited at trial" or at summary judgment.  *See Jackson v. Okaloosa Cty., Fla.*, 21
F.3d 1531, 1536 n.5 (11th Cir. 1994); *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003)
("Defendants may certainly test [Plaintiff's] standing as the litigation progresses by requesting an
evidentiary hearing or by challenging [his] standing on summary judgment or even at trial.").

Ole Miss appears to demand specific allegations to establish entitlement to specific forms
of injunctive relief.  But "[a]t the pleading stage, *general* factual allegations of injury resulting
from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general
allegations embrace those specific facts that are necessary to support the claim."  *Lujan*, 504 U.S.

at 561 (emphasis added) (internal quotations marks omitted). Mr. Sisco does not need to allege "specific facts" at this stage. *See id.* So long as the Court can "presume specific facts under which [Mr. Sisco] will be" entitled to injunctive relief, Mr. Sisco has satisfied his burden. *See Bennett v. Spear*, 520 U.S. 154, 168 (1997). In other words, "supplying details is not the function of a complaint," and a complaint will defeat a motion to dismiss if the Court can "imagine facts *consistent with* th[e] complaint … that will show plaintiffs' standing." *Alliant Energy Corp. v. Bie*, 277 F.3d 916, 920 (7th Cir. 2002) (emphasis in original); *see also Hotze v. Burwell*, 784 F.3d 984, 992 (5th Cir. 2015) ("[W]e will not dismiss for lack of standing if we reasonably can infer from the plaintiffs' general allegations that [the plaintiff] has [standing]."). Because the Court can easily infer that Mr. Sisco will continue to be harmed by the alleged violations in the complaint, it need not delve any further than that.

In short, the Court should conclude that it is premature to dismiss any injunctive-relief claims at this early stage because (1) Ole Miss's concedes standing for at least "some" of the injunctive relief sought, (2) there is no pending motion for injunctive relief, and (3) Mr. Sisco has live damages claims. *See Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 625 (7th Cir. 2017) ("The[] complaint also includes a request for injunctive relief, but it is premature for us to say whether they do or do not have standing for this part of the case."); *Friends of Frederick Seig Grove #94 v. Sonoma Cty. Water Agency*, 124 F. Supp. 2d 1161, 1172 (N.D. Cal. 2000) (denying motion to dismiss request for injunctive relief because "[w]hile the Court may ultimately agree with the defendants that injunctive relief is inappropriate, it is by no means evident that the Court can reach such a determination on a motion to dismiss"); *C. ex rel. Connor v. Missouri State Bd. of Educ.*, No. 4:08CV1853 HEA, 2009 WL 2928758, at *4 (E.D. Mo. Sept. 8, 2009) ("Because the Court must assume the facts as alleged in a motion to dismiss, it is premature to determine

whether Plaintiff lacks standing to pursue injunctive relief."); *Quade v. Milyard*, No. CIVA 07-cv-00229-WYD-MJW, 2008 WL 4097471, at *8 (D. Colo. Aug. 5, 2008), *report and recommendation adopted in part, rejected in part,* No. CIVA 07-cv-00229-WYD-MJW, 2008 WL 4097469 (D. Colo. Sept. 2, 2008) ("This court finds that defendants' motion to dismiss the claim for injunctive relief is premature and should be denied. The appropriateness of permanent injunctive relief need not be analyzed by the court unless and until the plaintiff prevails.").

Finally, to the extent the Court deems it necessary to further investigate the issue, Mr. Sisco easily satisfies the standing requirements for injunctive relief. To establish injury-in-fact for an injunctive-relief claim, a plaintiff must "demonstrate[e] a continuing injury or threatened future injury." *Crawford v. Hinds Cty. Bd. of Supervisors*, 1 F.4th 371, 2021 WL 2446792 at *2 (5th Cir. 2021). "That threatened future injury … must be 'imminent,'" which means that "there must be at least a 'substantial risk' that the injury will occur." *Id.* "Past wrongs are evidence of the likelihood of a future injury but do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *Id.* (cleaned up).

*Crawford* is on point here. The court held that a wheelchair user had standing to seek injunctive relief against a county where he had twice been unable to fulfill his jury duty because the courthouse was inaccessible to him. *Id.* at *3. The court reasoned that there was a "substantial risk of [his] being called for jury duty again," and that the harm was "imminent" because he alleged a "systemic exclusionary practice" rather than "a one-off, episodic exclusion." *Id.* As in *Crawford*, Ole Miss's failure to caption videos is "systemic," not "episodic." *See id.* Furthermore, "[p]ast wrongs are evidence of the likelihood of a future injury," and Mr. Sisco alleges myriad past wrongs. *See id.* Finally, given Mr. Sisco's deep ties to Ole Miss, there is a substantial likelihood that the harms alleged here will recur. *See id.* (noting that the county "is not extremely populous

23

… so it's fairly likely that Crawford will again, at some point, be called for jury duty"). The fact that he's no longer a student does not matter—Ole Miss's social media videos are published to the entire universe of Ole Miss fans, and its stadiums and arenas are open to the public as well. *See id.*; *see also Price*, 375 F. Supp. 3d at 1274 (M.D. Fla. 2019) (considering the "ties or connections a plaintiff has to the defendant governmental entity" to determine whether he has standing to seek injunctive relief under Title II). Just as Ole Miss must make its stadiums accessible to non-student football fans who use wheelchairs, it must make its social media videos and common areas accessible to non-student fans who wish to enjoy them.

It is true that NewsWatch is now captioned. Doc. 14 at 10 ¶ 97. But "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). Otherwise, "[t]he defendant is free to return to his old ways." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953). Accordingly, Ole Miss must meet a "stringent" standard by showing that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). Ole Miss cannot meet this "heavy burden."

For example, the Fourth Circuit held that the Washington Football Team had not "discharged [its] heavy burden of showing no reasonable expectation that they will repeat their alleged wrongs," because it "did not actually provide captioning [in the football stadium] until after plaintiffs filed their complaint." *Feldman v. Pro Football, Inc.*, 419 F. App'x 381, 387 (4th Cir. 2011). The court noted that the team "maintain[ed] complete control over the captioning" and that "[g]iven the ease with which [it] could stop providing captioning," the team could not meet its burden under the voluntary cessation doctrine. *Id.* Likewise, Ole Miss "did not actually provide

24

captioning" for NewsWatch until after Mr. Sisco filed his OCR complaint. *See id.*; doc. 14 at 10 ¶ 97. And without injunctive relief, Ole Miss would be "free to return to [its] old ways." *See W. T. Grant Co.*, 345 U.S. at 632. As a result, the Court should reject Ole Miss's argument that any injunctive-relief claims with regard to NewsWatch are moot. *See Innes v. Bd. of Regents of the Univ. Sys. of Maryland*, 121 F. Supp. 3d 504, 510 (D. Md. 2015) (rejecting mootness argument where the defendant "made a multi-million dollar capital investment in technology to provide ribbon boards and captioning").

## CONCLUSION

For the reasons given above, the Court should deny Ole Miss's motion to dismiss.


Respectfully submitted,

July 20, 2021

___/s/ Chris Edmunds_____

Chris Edmunds, Counsel for Plaintiff
LBSA: 37670
Chris Edmunds Law Office
4937 Hearst St., Suite 2F
Metairie LA 70001
(504) 314-0034
chrisedmundslaw@gmail.com